# A. L. COPPAGE v. STATE.

No. A-10346.    Oct. 20, 1943.
(142 P. 2d 371.)

L. A. Justus and F. J. Lucas, both of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Dixie Gilmer, Co. Atty., of Tulsa, and Horace Ballaine, Co. Atty., of Pawnee, for defendant in error.

BAREFOOT, J.    Defendant, A. L. Coppage, was charged in the district court of Tulsa county, Okla., with the crime of sodomy.    His case was transferred on change of venue to Pawnee county, where he was tried, convicted, and sentenced to serve a term of ten years in the State Penitentiary at McAlester.    From this judgment and sentence he has appealed.

Defendant has presented and argued in his brief eight assignments of error. These assignments will be considered under three heads, as several of them are so similar that they may be considered together.

"First: The verdict of the jury was contrary to the evidence; founded upon the uncorroborated, impeached, contradictory, vague, improbable, uncertain and indefinite testimony of Hartsill Brown, the prosecuting witness; and said evidence was insufficient as a matter of law to sustain a verdict of guilty.

"Second: (a) The trial court erred in admitting incompetent, irrelevant and prejudicial evidence upon the part of the state, by reason of which error the defendant was deprived of his constitutional right to a fair and impartial trial.

"(b) Error of the trial court in permitting highly improper and prejudicial conduct upon the part of the county attorney which conduct prejudiced the rights of defendant and prevented defendant from receiving the fair and impartial trial as provided by the laws and Constitution of this state.

"Third: The verdict of the jury was founded upon passion and prejudice."

This same defendant, prior to his trial in this case, was tried and convicted in the district court of Tulsa county on a charge of rape. He appealed to this court, and the case was reversed and remanded. Coppage v. State, 76 Okla. Cr. 428, 137 P. 2d 797. Because of the connection of the two cases, and the reference to this case in that opinion, it is here cited.

The state did not file a brief in this case.

The charge in the instant case was presented by an information filed in the district court of Tulsa county on November 7, 1941, the charging part of which is as follows:

416

"* * * on this the 7 day of November, A. D. 1941, and gives the Court to understand and be informed that A. L. Coppage on the first day of April, 1941, in Tulsa County, State of Oklahoma, and within the jurisdiction of this Court, did unlawfully, wilfully, and feloniously commit the detestible and abominable crime against nature, to-wit: sodomy, committed in way and manner as follows, that is to say, by then and there having unnatural and carnal copulation in the mouth with one Hartsill Brown, contrary to the form of the statutes * * *."

The motion for change of venue was based solely upon the publicity given by the Tulsa newspapers against this defendant in this and the case above cited, and was granted upon that ground alone.

The first assignment of error makes it necessary to review the evidence. Defendant was charged with the crime of sodomy upon one Hartsill Brown, age 17 years, on the night of April 1, 1941, about 11:15 p. m. The prosecuting witness testified that he lived at 419 South Quebec, in the eastern part of the city of Tulsa. That on April 1, 1941, he was attending school, and working after school at Sharp's Hatchery in downtown Tulsa. That he left the hatchery about 10 or 10:15 on the night in question, walked seven blocks and caught the Eleventh street bus, and got off the bus at Eleventh and Quebec. That he started walking north on Quebec about 11 or 11:15. Some one unknown to him came up from the rear when he was within four blocks of home and stopped his car and asked him if he wanted to ride. "So I said 'Sure' and I got in." He spoke to the party and said something about the major league ball teams, but was not answered. The party who had picked him up then stopped his car on the public street, placed a gun in the left side of witness, and upon threats that he would kill him, committed an

act upon the witness with his mouth, the particulars of which it is unnecessary to state. While committing this act, defendant made the witness put his head and hands out of the window of the car. He then informed witness that he knew who he was, and where he lived, and drove within less than a block of his home, and let the prosecuting witness out of the car. The witness, when he arrived home, told his stepmother and stepbrother what had happened. His father reached home about 30 or 40 minutes later, and he and his father went to the police station and made a report of the attack to the police officers. Witness gave a description of the party who had picked him up to the police officers.

So far as the record reveals, nothing further transpired with reference to this case until September 25, 1941, when two police officers went to the school of the prosecuting witness after him.

"Q. What did they say to you, Hartsill, when they came after you at the school? A. Mr. DeMoss said to me, 'We want you to come down to the police station; we think we have the hoodlum that picked you up last April, we want you to identify him.' "

He went to the police station and positively identified the defendant as the party who had picked him up on the night of April 1, 1941. There were four or five parties lined up, and he picked the defendant from among them. At the time of the trial he positively identified the defendant as the party who had picked him up, and had committed the act as charged.

The direct and cross-examination of the prosecuting witness was very thorough. We will not incumber the record with quoting from it at length. He testified that he was positive that the act occurred on the night of April 1, 1941, and this is corroborated by the records of the

police station, which disclosed that he reported the occurrence on that night. He stated that in his opinion it 'did not rain that night, and it was not raining at the time he entered the car. It was very dark. The car in which the party who picked him up was riding was a dark Chevrolet car, with yellow or cream colored wheels; that the upholstering of the car was in bad shape. At the trial he would not say positively whether there were seat covers on the car or not, but at the preliminary examination he testified positively that there were no seat covers on the front seat. At the trial he testified that the front seat was divided and had two seats. At the preliminary he testified that it was one straight seat. He was unable to testify whether there was a radio, heater, radiator cap, or two large horns on the front of the car. He did not secure the tag number of the car and was therefore unable to give it. At the time of the preliminary, on October 20, 1941, he had not examined the car, but on the afternoon of that day and after the preliminary examination, he examined the car at the suggestion of the police matron, and positively identified it as the car which he entered on the night of A'pril 1, 1941. One of the means by which he identified the car was the color of the wheels. He testified:

"Q. Will you tell us, please sir, the color of the wheels of the 1933 Chevrolet? A. They were yellowish, cream color spoke wheels. Q. Will you tell us the color of the wheels of the 1933 Chevrolet that you saw in October, 1941? A. It was the same color. * * * Q. Was there anything unusual about a Chevrolet those color wheels, by which you could identify it and distinguish it from some other 1933 Chevrolet? A. No, it just had yellow wheels is all."

The state then introduced a number of witnesses who testified to numerous minor details, none of which connected the defendant with the actual commission of this

crime. It was proven that defendant owned a 1933 Chevrolet automobile, and it was the one identified by defendant on October 20, 1941. Defendant had sold this automobile to M. A. Whitley of the Parrott Motor Company in the latter part of June, 1941, and purchased from that firm a Plymouth car, which he was driving at the time he was arrested on September 25, 1941. Mr. Whitley testified that he drove the Chevrolet car prior to buying it, and that it had seat covers on it. They were in good condition, and fully covered the upholstery. The car was sold by the Parrott Motor Company to Theodore Mc-Cracken, who testified that he sold the car to Clarence Hall. Mr. Hall testified that he purchased the car on July 2, 1941, and that he was the owner of the car on October 20, 1941, at the time it was examined by the prosecuting witness.

The witness Theodore McCracken was subpoenaed by the state as a witness, and was afterwards used by the defendant, and testified as follows:

"Q. Now, at the time you bought this car, do you recall the color of the wheels? A. I believe they were red. I am pretty sure they were. Q. Now, after you purchased this car, between the month of June and the 20th of October, Mr. McCracken, did you have occasion to paint the car, and change the color of it? A. Yes, sir. Q. Will you tell the jury, please sir, just what you did to the car after you purchased it? A. I painted the body blue, and the wheels cream. That is all that I did to the car."

Several police officers testified for the state. Their testimony was with reference to the arrest of defendant, on September 25, 1941. He was taking his two little girls to school in the Plymouth car, and when they drove up, he was arrested. There was nothing in his arrest that gave any information that would connect defendant with the

crime with which he was charged. The officers testified to the finding of a small toy pistol in the car. There was no evidence to connect this toy pistol with the one used by the party against the witness Hartsill Brown on the night of April 1, 1941. Defendant stated that he did not know of the toy pistol being in the car, but had seen one around the home, and that it had probably been placed there by the children while playing in the car. Coppage v. State, supra.

Beulah Johnson, a police matron, testified to taking the witness, Hartsill Brown, to examine the Chevrolet car on October 20, 1941, after the preliminary examination.

Two officers testified that after defendant was arrested, in their presence Police Officer Phillips, who was a friend of defendant, questioned him and asked him if he were guilty, and defendant told him he was not guilty. That Officer Phillips then told him he had known of people getting off lighter if they were guilty and pleaded guilty, and defendant then asked him what he would get if he did plead guilty. It occurs to us that this could in no way be construed as a confession or statement of guilt by the defendant. We stated in the case of Coppage v. State, 76 Okla. Cr. 428, 137 P. 2d 803, supra:

"The evidence of the police officers as to their conversation with defendant cannot be considered as a confession, or even as a statement against interest. All of the officers who testified in reference thereto clearly stated that defendant at no time admitted that he committed this crime, but that he denied committing the same. It is readily observed from a reading of the record that the police officers were attempting to have different parties identify defendant, and thus connect him with a number of crimes. It was not unusual that defendant under these circumstances should have made inquiry of

the officers, as he said he did, as to what punishment he would receive if he entered a plea of guilty. He could have very easily been considering the publicity, humiliation and disgrace that would be brought upon his family by a public trial of the charges, and for this reason made the inquiry as to the punishment he would receive if he entered a plea of guilty. We are not saying that this evidence may not have been proper for the consideration of the jury, but the explanation which he gave was very reasonable in view of the facts and circumstances of this case."

The conversation between the officers and the defendant in this case was practically the same as in that one.

This was all of the evidence of the state.

It was the contention of the defendant that he was not guilty of the crime charged; that he had been falsely accused, and his defense was that of an alibi. It was his contention that he and his wife entertained a card club to which they belonged, and which had been organized for a number of years, in their home on the night of April 1, 1941. That this party began about 7:30 and continued to from 12 to 12:30. That he was present at all times and did not at any time leave his home on that night, after the guests arrived. The evidence revealed that there were present at this party Mr. and Mrs. Bradford, Mr. and Mrs. Barnes, Mr. and Mrs. Layman, Mr. and Mrs. Jones, Mr. and Mrs. Lairmore, and Mr. and Mrs. Coppage, all highly respected citizens of Tulsa. Testifying for defendant were Mr. and Mrs. Bradford, Ben Layman (his wife was in California at the time of the trial and did not testify); Mrs. Pauline Lairmore (her husband had been subpoenaed as a witness but was excused for the reason that he was a bonded employee for the Tulsa Armed Express, and no one could take his place

while absent to testify) ; L. V. Jones (his wife did not testify on account of illness) ; Mrs. Coppage, the wife of defendant, and his two little girls, ages 11 and 15 years, respectively; and it was agreed that Mr. and Mrs. Barnes had moved to San Antonio, Tex., and for this reason did not testify. All of these witnesses testified to being present at the party, and that defendant was there at all times, and did not leave during its progress. Some of them did not recall the exact date, others did by reason of certain circumstances, and those who could not remember the date, remembered the circumstances. All recalled that the little girls of defendant had shown them clothes which had been purchased for them for Easter. Mr. and Mrs. Bradford recalled the date by reason of having purchased and planted certain seeds at their farm the day before the party. They exhibited the receipted bills for the seeds, which showed the date on which they were purchased. They also recalled that it was raining at the time they went to the party, and that the defendant had backed his car across the street to their house and had taken them across to his home while it was raining. Also that the little girls had borrowed chairs for the party.

Mrs. Coppage kept a diary or calendar which had been given her by her church and it was introduced in evidence, and the party had been noted as having been given on April 1, 1941. The item therein was made in regular order, and there was a notation entered on April 2nd, showing that the party was given on the night of April 1, 1941. She also testified to the purchase of certain articles on the date of April 1st and receipted bills were introduced showing the date of purchase. She testified to her normal physical condition at the time her husband was charged.

It was also testified by several others that it being April Fools Day, salt had been placed in the tea of one of the guests.

The two little girls of the defendant, ages 11 and 15 years, testified to having gone to school that day, and of borrowing chairs from one of the neighbors for the party. They further identified the date by reason of not going to an April Fool party, but staying at home to assist their mother with her party; that they remained up until the party ended, and their father was there all of the time.

In the first part of this opinion we stated that the defendant had, prior to the trial of this case, been tried in the district court of Tulsa county for the crime of rape, and an appeal had been taken to this court, and that the case had been reversed and remanded. Coppage v. State, supra. In that case defendant was charged with rape of a negro woman in Tulsa county on April 28, 1941, just 27 days after the crime charged in the instant case. Defendant was arrested September 25, 1941, placed in jail and was identified by both prosecuting witnesses.

During the cross-examination of Mrs. Coppage, wife of the defendant, the following proceedings were had before the court:

"Mr. Gilmer: We are going to ask her next if it is not a fact her husband was tried in the district court of Tulsa county for a rape of a colored woman by the name of Alma Floyd and if she does not know that of her own personal knowledge. The Court: I think probably you have probably laid the proper predicate for it, and it was on direct it was brought out. I don't see how you can get around it. Mr. Gilmer: She was present at the preliminary too. The Court: She stated on direct examination she had never had it called to her attention. Mr.

Gilmer: Yes, sir. The Court: So I don't see how you can get around it. Mr. Justus: We want to object. The Court: I will allow you to make a complete record. Mr. Kennon: If the court please, may I have permission to let Mr. Gilmer take over the examination? He is more familiar with it. The Court: Yes, I have no objection."

Thereupon the proceedings were resumed in the hearing of the jury:

"(Mr. Gilmer) Q. Mrs. Coppage, is it not a fact that you were in the district court of Tulsa county sometime about the first week of December this year, at which time your husband was tried and convicted for the rape of a negro woman by the name of Alma Floyd? Did you know about that? Mr. Justus: To which question the defendant A. L. Coppage objects as incompetent, irrelevant, immaterial, highly prejudicial and by reason of the statement the defendant, A. L. Coppage, now moves for a mistrial of this case. Mr. Lucas: Improper cross-examination. The Court: Gentlemen of the jury, under the admonition formerly given you, you will be excluded from the courtroom for a few minutes. You will remain within call and please remain outside of the courtroom. Reporter's note: Thereupon the jury retired from the courtroom, and at the conclusion of discussion between court and counsel were recalled to the courtroom and the following proceedings had in the presence and hearing of the jury and the defendant: The Court: Gentlemen of the jury, the court sustains the objection to the last question asked this witness, and you are instructed at this time that you shall give no weight to the question of the county attorney in that respect, and totally disregard the last question asked this witness. Proceed. Mr. Justus: Let the record show that the defendant excepts to the ruling of the court and the defendant desires now to again renew his motion for a mistrial of this case and asks the court to discharge the jury at this time by reason of the question asked by the county attorney. The Court: The motion of the defendant for mistrial is over-

ruled and denied. Mr. Justus: Exception. The Court: Very well, let us proceed."

It will be noted that when this question was asked the jury was present. After the question was asked, the jury was withdrawn, and after argument by counsel, the court sustained an objection to the same and instructed the jury not to consider it.

It is strenuously contended by the defendant that the asking of this question in the presence of the jury constituted prejudicial error, and that the court erred in refusing to grant a mistrial at this time. With this contention, after a review of the entire record, we agree. We have carefully examined the record as to the direct examination of the witness, and there was nothing asked the witness on direct examination which would justify the asking of the question above quoted, in the presence of the jury. We cannot conceive of any theory or reason for the asking of this question of the wife of the defendant, except to prejudice the jury against the defendant. There was no relation between the two crimes. If they were committed, they were different crimes, and at different times. It is a well-defined general rule that one should only be placed on trial for the crime with which he is charged in the information. We recognize, and have recognized, that there are well-defined exceptions to this rule. In the case of Williams v. State, 68 Okla. Cr. 348, 98 P. 2d 937, we have discussed, reviewed and cited the authorities covering this proposition, and it is unnecessary to quote therefrom.

The facts in the instant case do not bring it within the exceptions to the general rule. As above stated, we see no reason for the asking of this question, except that the county attorney evidently came to the conclusion that the defendant was not going to take the witness stand

in this case, and that by asking his wife this question he could get before the jury the fact that the defendant had been previously convicted in Tulsa county of the crime of rape upon a negro woman. This, in our opinion, was an unfair advantage, and resulted in prejudice to the rights of the defendant, and caused his conviction. From an examination of the entire record in this case, one can but come to the conclusion that it was the information given by this question to the jury which caused them to return a verdict of guilty against this defendant, and that for such error this case should be reversed. Rogers v. State, 8 Okla. Cr. 226, 127 P. 365; Kirk v. State, 11 Okla. Cr. 203, 145 P. 307; Wisdom v. State, 18 Okla. Cr. 118, 193 P. 1003; Millett v. State, 36 Okla. Cr. 309, 253 P. 1039; Chatham v. State, 65 Okla. Cr. 240, 84 P. 2d 804; Mercer v. United States, 3 Cir., 14 F. 2d 281; 16 C.J. § 1132, p. 586; 22 C.J.S., Criminal Law, § 682.

The evidence relied upon for a conviction depended upon the identification of the defendant by the prosecuting witness. While his identification was positive, many circumstances surrounding this identification are uncertain. He was evidently mistaken in a number of material facts. His identity was based principally upon the identification of the automobile, and from his examination of it on October 20, 1941. This was a period of six months from the time he had entered the automobile on the night of April 1st. The car had been repainted, and the wheels had been painted a different color, yet his testimony was that the car was just as it was on April 1, 1941. There are other serious conflicts between his testimony at the preliminary examination and his testimony at the time of the trial; and when we take into consideration that his testimony is so directly in conflict with the testimony of the witnesses who attended

the party at the home of this defendant on the night of April 1, 1941, it certainly gives evidence of an uncertainty that this defendant was the person who committed this crime. These witnesses were highly respected citizens who would have no reason to falsify their testimony. The records presented confirmed their evidence in every respect. They clearly established the fact that the party was given on the night of April 1, 1941, the same date as charged in the information. The incident of the salt being placed in the tea of one of the guests as an April fool prank was recalled by the witnesses present. The date in the diary, or calendar kept by Mrs. Coppage, which shows that it had not been changed or inserted therein, but had been entered in its natural order many months prior to the arrest and charge against the defendant, and many other circumstances as revealed by the record, are not only inconsistent with the identification of defendant by the prosecuting witness, but his own evidence is so uncertain and is contradictory in so many instances with positive facts, that we can not read this record as a whole and come to any conclusion but that the verdict returned by the jury in the case was the result of passion and prejudice. The fact that the jury was given the information that the defendant had been previously convicted in Tulsa county, where he was charged with the rape of a negro woman, was undoubtedly the cause of the passion and prejudice against him, and caused his conviction in this case.

In the case of Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530, 539, a case in which the defendant was positively identified, we said:

"In view of the contradictory and unsatisfactory evidence in this case, and the fact that practically every witness used by the state tended to corroborate the state-

ment made by the defendant, with the exception of the positive identification of the defendant by the Monteilh family, and the uncertainty of this testimony being correct as to the defendant being the party whom they saw, we cannot do otherwise than reverse and remand this case.

"It is true that the prosecutrix was assaulted and the perpetrator of this crime should not go unpunished, but the evidence as to the defendant being the party who did it is not only conflicting and unsatisfactory, but is highly improbable. This testimony in conjunction with the physical facts, and the corroboration of the defendant by the state's own witnesses, leads to but one conclusion; that there was a case of mistaken identity."

See also Williams v. State, 68 Okla. Cr. 348, 98 P. 2d 937.

For the reasons above stated, the judgment and sentence of the district court of Pawnee county is reversed, and the case remanded.

It appearing from the record that this defendant has been confined in the State Penitentiary at McAlester since his conviction by reason of being unable to make bond, it is hereby ordered and directed that the warden of the penitentiary deliver said defendant to the sheriff of Pawnee county, Okla., subject to the further order of the district court of that county.

JONES, P. J.. and DOYLE, J., concur.